## JOHN BATESON v. THE STATE.

No. 2986.  Decided March 23, 1904.

**1.—Judge—Should Be Present at All Times of Trial.**

It is necessary that the district judge be present and presiding during the trial of a felony in his court throughout the entire progress thereof, otherwise a conviction can not be sustained.

**2.—Same—Matters Presented by Affidavit.**

The question of the conduct of the judge can be presented by affidavit, and the mere unsworn statements of the judge are not sufficient upon the matter contested.

**3.—Same—Judge Must Keep Control of Case.**

Where, during the argument of counsel, the trial judge absented himself for some time and retired to an adjoining room to write his charge, closing the door at times and not being so situated as to determine and know of his own eye and his own ear that the trial was being legally conducted, a conviction of murder will be set aside.

**4.—Evidence—Res Gestae.**

Where a witness was permitted to repeat a part of the statement of the defendant made by him to witness five or six minutes after the difficulty

between him and deceased which resulted in the latter's death, the witness should have been permitted to state the whole of such statement, although the latter part of it was made a minute or such matter after the first, the whole of the statement being closely connected and part of the res gestae.

### 5.—Same—Matters of Opinion.

A witness can only state matter involved in a dying declaration to which deceased could testify if alive and a witness on the stand and could not give in evidence matters of opinion, and witness should not have been permitted to state that deceased told him, "Tell my wife good-bye;" and "They murdered me without cause."

### 6.—Same—Impeaching and Direct Evidence.

It was competent for the State to prove defendant's declarations that he would hold deceased to the proposition to go with him before the constable and settle a matter of dispute, both as impeaching testimony and direct evidence to show animus of defendant toward deceased.

### 7.—Charge of the Court—Provoking the Difficulty.

There was no error to charge on provoking the difficulty, where the evidence showed that the conduct and language of defendant toward the deceased was sufficient to have provoked an assault, although there was a conflict in the evidence on this point.

Appeal from the District Court of Johnson. Tried below before Hon. W. Poindexter.

Appeal from a conviction of murder in the second degree; penalty, thirty-five years imprisonment in the penitentiary.

The opinion sufficiently states the case.

*S. C. Padelford* and *Odell, Phillips & Johnson,* for appellant.—The uncontradicted facts in this case show that for about three hours during the argument of counsel and while the defendant was being tried, the presiding judge vacated the bench, left the court room, went into an adjoining room separated from the court room by a brick wall and a heavy door, with the door shut, and was thus beyond the sight and hearing of the trial, and that for at least three hours the defendant was being tried by a jury without a presiding judge, and hence his conviction is without due process of law. Lott v. State, 18 Texas Crim. App., 627, and authorities therein cited; Marks v. State, 10 Texas Crim. App., 334; Hill v. People, 16 Mich., 361; Stell v. State, 14 Texas Crim. App., 59; 17 Am. and Eng. Enc. of Law, 2 ed., p. 720; Stokes v. State, 71 S. W. Rep., 248; Ellerbee v. State, 41 L. R. A., 569; People v. Blackman, 127 Cal., 248; Palm v. State, 57 N. W. Rep., 743; Smith v. Sherwood, 70 N. W. Rep., 682; 14th Amendment Const. U. S.

The testimony of the witness McLain, which was excluded over the objection of defendant, was clearly a part of the res gestæ and would have been of substantial benefit to the defendant if same had been permitted to go before the jury. The defendant offered the testimony of Charles McLain, in substance and effect that appellant ran up to witness and said to him that he wanted to surrender, that he had cut Will Pate; and further, "I am afraid I have cut him bad; I did not aim to do it. Lord, what will I do? Won't you go for a doctor for him? I will pay for it. Won't you let me go and see my wife and children?"

Witness said come out here and tell me what you have done, and then said, "I took him up by a tree in the courthouse yard and he started to tell me; asked him if he cut him and he said yes, but that he [meaning Pate] cut at him [defendant] with a knife first." Witness said, "Is that the knife you cut him with?" and he said yes.

On cross-examination the witness said when appellant came up to him he was walking a kind of fast walk; he was not exactly running, it was kind of a fast walk. Witness further said that the tree was about twenty feet from the point where he first met appellant. In this connection witness testified that appellant was shaking and was crying like, greatly excited, and that this excitement continued until after appellant made the statement at the tree, and until after he had been turned over to the sheriff and the sheriff started with him to the jail. That he was not composed at any time. The court admitted all that was said prior to the time witness and appellant reached the tree twenty feet away from the first meeting place. Witness said that appellant had made about all this talk before they got to the tree, that he kept running his hand over his forehead and through his hair like. The court excluded the statement that he had cut Pate, but that he (Pate) cut at him with a knife first, and that the knife he had in his hand was the knife that he cut him with. In explanation of this bill of exception the court uses the following language: "With explanation that this witness McLain stated, as will be seen, that he had not been at the tree more than one minute when Sheriff Long came up and took defendant in charge, and said that Pate was dead. The evidence shows about how long deceased lived after he was stabbed, which was more than one-half hour. It is doubtful if any of this statement was admissible, but certainly that part excluded was not admissible." The appellant's exception to the court's ruling was, in substance and effect, that the whole of the conversation, statement and declaration appeared to be and was in fact a part of the res gestæ; that it was shown in this connection that the State's witness Long received the defendant Bateson into his custody not longer than two or three minutes from the time of the killing. The witness Long had testified that he was on the market square at the time of the killing and not having covered a distance of more than 250 or 300 yards until receiving the defendant from the hands of the witness McLain, traveling as fast as he could, not to run, until he did so receive him. From an inspection of the record it will be seen that the court's explanation, to say the least of it, is an afterthought, not borne out by the record. The court's effort in this explanation to convey the idea that Pate was dead at the time Long reached Bateson is wholly at variance with the record in the case, and with all the testimony heard in the case up to the time this evidence was offered. Griffin v. State, 50 S. W. Rep., 366; Freeman v. State, 51 S. W. Rep., 230; Honeycutt v. State, 57 S. W. Rep., 806, and authorities cited in these several cases.

It is a well settled rule that dying declarations should not be extended beyond the transaction which immediately caused the death; that additional communications throwing no light on the immediate circumstances of the death should not be allowed; that the witness who details the dying declaration can go no further in his statement, than the dead man could were he alive and a witness on the stand. As an illustration of exclamations that have been held inadmissible we desire to call the court's attention to the case of Sullivan v. State, 102 Ala., 48 Am. St. Rep., 22, and authorities there cited. The exclamation there was "I pray God to forgive him." This was held to be inadmissible, prejudicial and reversible error. In State v. Perigo, 80 Iowa, 37, 45 N. W. Rep., 399, the language was, "that it was hard to be murdered on his own farm;" this was held to be inadmissible and prejudicial. In State v. Nelson (Missouri), 14 S. W. Rep., 712, the declaration by the dying man "that he did not want defendant prosecuted," held inadmissible on behalf of the defendant. Of course all these statements are irrelevent, immaterial and inadmissible because they throw no light on the issue in controversy. In Crookhem v. State, 5 W. Va., 510, deceased was asked if he had any statement to make; "none except he said it was hard to die by the hand of another and leave his family," held prejudicial and reversible. Warren v. State, 9 Texas Crim. App., 627, is a very able discussion of the doctrine of dying declaration and what is admissible and what not; also Hackett v. People, 54 Barr, 370; People v. Sweeney, 41 Hun, 332. See also State v. Shelton, 64 Am. Dec., 587. Now in the case at bar, tested by these rules, and we believe them to be correct, the witness should not be permitted to make these extraneous statements that throw no possible light on the circumstances of the difficulty which resulted in death of the deceased. He said "He was going to die; that he was dying; tell my wife goodbye." "I am dying; they have taken my life," and he repeated that several times. That this language was wholly irrelevant and immaterial, in view of the fact that the stabbing was not denied; that the defendant stabbed the deceased was not denied; that the deceased himself made his own statement in his own language as to what he did and as to what the defendant did, it seems to us strange indeed that the trial judge admitted it.

On question of admitting testimony of Guy Pegues: Vann v. State, 11 S. W. Rep., 813; Denton v. State, recently decided.

On question of provoking the difficulty: Morgon v. State, 34 Texas Crim. Rep., 222; Casner v. State, 2 Texas Ct. Rep., 559; Pollard ·v. State, 7 Texas Ct. Rep., 548; Fant v. State, 57 S. W. Rep., 819; Dodd v. State, 5 Texas Ct. Rep., 363; Teel v. State, 5 Texas Ct. Rep., 574; Poer v. State, 67 S. W. Rep., 500; Tollett v. State, 55 S. W. Rep., 573; Vann v. State, 77 S. W. Rep., 813; Carter v. State, 35 S. W. Rep., 378; Franklin v. State, 34 Texas Crim. Rep., 286.

*Howard Martin,* Assistant Attorney-General, and *Mason Cleveland,*

County Attorney, for the State.—On question of the judge's absence during the trial: Lewis v. State, 15 Texas Crim. App., 647.

In regard to the question of res gestæ statement of the defendant to the witness McClain, we believe that the court was correct in excluding the part of the statement of the witness as to what the defendant stated after a request by the witness to tell him how it occurred, as it was purely and simply an attempt on the part of the defendant to relate the circumstance, and does not come within the rule.

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of thirty-five years; hence this appeal.

The evidence shows that appellant and deceased were neighbors, living some two or three miles from the town of Cleburne, Johnson County. A short time before the homicide (which occurred on January 4, 1904) two neighbor boys not related to either appellant or deceased had a fight. Some one reported them to the constable in Cleburne, and a complaint was made against them; and on the trial a fine was assessed against them, which they paid. The trouble which resulted in the difficulty came up between appellant and deceased with regard to who should have reported the boys to the constable. Appellant's own testimony tends to show that he understood deceased charged him with reporting it. Appellant called on deceased about this rumor several days before the homicide, and wanted deceased to go with him before the constable and have it determined who did report the boys. Deceased declined at the time, but promised to go with appellant at a later date. It seems appellant himself subsequently went to the constable, and ascertained it was deceased who had reported the fight between the boys to the constable. Subsequently to this he saw deceased in regard to the matter, and deceased promised him that he would go with him to the constable on Monday. On Monday both parties came to the town of Cleburne. Appellant and Creed Friou, a relative of one of the boys who was fined, sought deceased for the purpose of getting him to go to the constable in order to settle the matter as to who reported the difficulty to him. There was a considerable crowd in Cleburne on that day, and it was some time before they found deceased, Pate. Friou found him first, and was talking with him about the report when appellant came up. At this point the State's theory is that appellant approached deceased and asked him to come on and go with him to the constable, and on his refusal to go, appellant called him a son of a bitch, and stabbed him, inflicting a mortal wound, from which he died in about thirty minutes. According to the appellant's theory, he approached deceased and asked him to go with him to the constable and settle that matter. Deceased said he would go with the interested parties. Appellant said that there was Friou, who was related to one of them, and he could get old man Guinn, who was there, and started on, thinking deceased was coming.

After going a step or two he saw deceased was not coming, and turned and said to him, "By Golly" (or "By God"), "I believe you are the man who reported the boys." That thereupon deceased, who had his knife in his hand, made a demonstration with it as if he was about to attack him, whereupon appellant stabbed deceased. This is a sufficient statement of the facts to present the questions of law.

In appellant's motion for new trial he calls in question the action of the court in absenting himself from the courtroom, and from the bench, and retiring into an anteroom and closing the door, and so remaining during the greater part of the argument of the case to the jury. We quote that portion of the motion, as follows:

"That defendant would show the court that the verdict of the jury and the judgment of the court rendered thereon ought to be set aside and a new trial granted him in this case, for the reason that he has been deprived of such a trial by a court and jury as is guaranteed him by the Constitution and laws of this State, and was deprived of a trial by due process of law, in that six hours, three on each side, was allotted the counsel for argument in this case; and during a major portion of the time the presiding judge of the court was absent from the courtroom, where he was being tried, and in a separate room, with the door leading from the room where he was being tried, closed and shut, and his trial was proceeding with the presiding judge without the sight and hearing of defendant, or his counsel, or the jury. The defendant would show that he was being tried for his life, and that his trial had excited great and unusual interest; that the district courtroom and the bar during the argument of his case was crowded to its fullest capacity, standing room not excepted; that the absence of the presiding judge from the courtroom wherein he was being tried as aforesaid, was greatly calculated to cause the jury who tried him to believe that he was so guilty of the offense with which he was charged he did not deserve the protection and the presence of the judge during the argument of his case, and only deserving the emotions and impulses and fury of the crowd surrounding him. Defendant would show that the presiding judge was absent as aforesaid during the argument of S. C. Padelford, Esq., counsel for defendant; of Mason Cleveland, county attorney and counsel for the State; of D. W. Odell, counsel for defendant, and during a major portion of the closing argument of C. F. Greenwood, counsel for the State. Defendant would show that the court opened the door and returned about twenty minutes before the argument by State's counsel had finally closed; that in his absence, and when his counsel could not reach the judge without delay and without undue notoriety and attention being directed to his action in passing by the jury to reach the judge, to the prejudice, as defendant avers, of his case, and until after a time when inflammatory appeals had been made to the jury, and sunk into their minds to his prejudice, and it is averred inflammatory appeals were made, and statements out of the record by said State's attorney in clos-

ing argument. Among other things, in detailing the testimony, said attorney stated to the jury that the official stenographer stayed up with him the night before and furnished him a copy of the testimony from which he quoted, and that therefore his quotations of the testimony must be correct; that there was no controversy about Bateson calling Pate a vile epithet and stabbing him; whereas it is averred that this was seriously controverted, but at the time no opportunity was presented to appeal to the judge to have the attorney stay in the record and not make statements with reference to what he and the official stenographer had done on the night before. It is further averred that during the absence of the said judge, said attorney, with the wife and children of deceased present in the court room, made an appeal to the jury, in the name of every man, woman and child in Johnson County, for the conviction of this defendant, and no appeal should have been made in the name of anyone, except in the name of the law; and during this inflammatory appeal the said judge was absent as aforesaid and no opportunity afforded defendant by his counsel to have it stopped. And again said counsel, in the absence of the judge aforesaid, in substance appealed to the judge on the bench (who was not on the bench, and not there to stop him) as a witness before the jury that he (counsel) was always fair in his prosecution; that he never abused or persecuted or got out of the record; and that after three years of experience before the judge in the trial of cases, the judge would bear him witness to that statement.

"And further in said argument, and during the aforesaid absence, the counsel appealed to the jury that counsel and defendant were not satisfied with denouncing the dead man as an informer; not satisfied with robbing the dead man's children of their father; the wife of her husband; they had denounced the dead man as a liar; and other inflammatory appeals, and statements out of the record, highly improper and prejudicial to defendant. If there be dispute or controversy as to the absence of the court from the courtroom, as to the door leading into the courtroom being closed and shut, as to their being no other opening into the courtroom, except this one door, which it is averred is a very heavy thick door, the defendant tenders as witnesses, in addition to his own affidavit, J. W. Sellars, Esq., a practicing attorney, whose attention was directed to it; Q. C. Templeton, clerk of the district court; W. B. Featherston, a practicing attorney; P. B. Ward, F. E. Johnson, and others."

And attached, in support of this motion, appellant filed the affidavits of D. W. Odell, Esq., J. W. Sellars, Q. C. Templeton and F. E. Johnson.

The State contested said motion, and in support of the contest, filed the statement of Wm. Poindexter. The supporting affidavits substantially support the allegations in the motion, to wit: That during the argument before the jury, Mason Cleveland, for the State, and S. C. Padelford and D. W. Odell, for the defense, and during the greater

portion of the closing argument of C. F. Greenwood, counsel for the State, Judge 'Poindexter retired from the bench and went into an anteroom, the door of which opened some six or eight feet from the jury, and there engaged with the stenographer in writing his charge. That during the greater portion of said time the door was closed between the courtroom and said anteroom, which cut off any view of the proceedings in the courtroom. That this action of the judge occurred with full knowledge of appellant's counsel, who, however, did not consent thereto. It is also shown in that connection that the case created a great deal of interest in Johnson county, and that the court room was crowded with people during the trial. It is also shown that during the argument on the part of the State's counsel in closing the case that he stated to the jury that the official stenographer sat up with him the night before and furnished him with a copy of the testimony, from which he quoted; and that therefore his quotation of the testimony must be correct. There was no controversy about Bateson calling Pate a vile epithet and stabbing him. Appellant says this was a material issue and seriously controverted by appellant; but no opportunity was presented to appeal to the judge, who was absent in his room, to have the attorney stay in the record and in making statements as to what he and the official stenographer had done on the night before. And it is also shown that inflammatory appeals were made to the jury, which was deemed highly improper and prejudicial to defendant. The controverting statement of the district judge admits his absence substantially as stated by appellant, to wit, that he was in his room at the back of the jury dictating his charge to the stenographer, and this with full knowledge on the part of the attorneys for the defense; that the door was ajar, and a part of the time it was closed; that as usual he made every effort to keep the door ajar, but at times it was not; that at one time he closed the door himself because Mr. Padelford in his speech talked so loud that he could not make the stenographer hear; that a part of Mr. Odell's speech he could hear as well with the door closed as open; that he could hear each of them audibly and nothing unusual happened; and that if it did, he gave no attention to it. That with reference to Mr. Greenwood's speech there was no objection made to any part of it, which could easily have been done if counsel for defendant had been disposed to do so; that no mention was ever made to him of any improper or injurious remarks of Mr. Greenwood. That there was no request made to instruct the jury to disregard anything Greenwood said in his argument; that there was perfect order during this trial in the court. That he was about six or eight feet from the jury at the time the speeches were made, and about twelve feet from Mr. Padelford when he was making his speech, and a little farther from Mr. Odell. That he could hear the argument as well in there as in the courtroom; that the judge can not have his mind on the charge, and at the same time on everything said; that he could understand what was going on, and see if there was anything unusual.

He also stated there was a brick wall between the jury and his office, where he was during the speaking; there is also a thick heavy door which does not fit up very tightly; that he could not see through the transom over the door; that he closed the door when he went into his room right after the noon hour, when the closing argument was commencing for the State, but he opened it again. That he remembered several persons coming in there and going out and closing the door; that he requested one Haynes, who came in there, to leave the door ajar; that it was true Mr. Odell excepted to his being absent from the courtroom once before, when the argument was being made in a criminal case. That was the case of State of Texas v. John Angel. He thought if he had asked counsel if they had any objection to his sitting in the anteroom, they would have agreed to it; that in this case he did not request permission of either of the attorneys to be absent, for the reason he usually kept the door open as much as possible, so that he would know what was going on. That he did not keep the door open all the time, but tried to. One time he closed it himself, the noise of the speaking being so loud he could not dictate his charge. At the time he dictated his charge in the John Angel case he was in the county attorney's office over on the other side of the courtroom from the jury, and was about three times as far from the jury as at the time of dictating his charge in this case.

This is a substantial statement of the evidence which raises this issue. We agree with the contention of appellant that a matter of this sort can be presented by affidavits; that when the contest is made, it should be clearly supported by affidavits, the mere unsworn statement of the judge not being sufficient. However, we do not understand the judge's statement to be materially different from the affidavits made on the part of appellant, and we will consider the question without regard to its being sworn to. We agree with the contention of appellant, that our Constitution guarantees the right of trial by jury, and that no citizen of this State shall be deprived of his life or liberty without due course of the law of the land; and that no person can be tried for a felony, unless such trial is had before the district court; and that this trial must be in open court; and that there can be no court, unless presided over by the district judge. So that, if the district judge was not present presiding at the trial and throughout the entire progress thereof, in such case there is no court, and a conviction can not be maintained. This direction and control must continue during the entire trial, and pervade every part thereof, for it can not be said that one portion of the trial is more important than another. Certainly it will not be contended that the argument before the jury, which is guaranteed to a defendant by the Constitution, is of so little importance as that the presiding judge need take no cognizance of it, much less absent himself during the argument. This question has been before a number of tribunals in the various States of the Union, and the current of authority in criminal cases is one way, with a very few exceptions; that is, in the trial of felony cases, espe-

cially in capital cases, the absence of the judge from the courtroom dur-
ing the trial will constitute cause for reversal in case of conviction. This
presence of the judge, who is the presiding genius of the court, is con-
strued not to mean absolutely within the courtroom, but so near as to be
within sight and hearing of the proceedings; that is, in such a situation
as to retain control of all that transpires during the trial. Otherwise,
there is no way by which the court can be informed as to any errors which
may occur, for as to these he does not get his information by proxy, but
he must judge of the matter by his own ear and his own eye. If by
absence, though temporary, the reins escape him and he loses that con-
trol and supervision of the court which is so necessary to safeguard every
right of a defendant in the particular case, and a conviction follow, it
will be set aside, notwithstanding no injury can be pointed out. In sup-
port of this doctrine we refer to the following cases: Stokes v. State,
71 S. W. Rep., 248 (Ark.); People v. Blackman (Colo.), 59 Pac. Rep.,
573; Graves v. People (Colo.), 75 Pac. Rep., 412; State v. Bauerman
(Kan.), 53 Pac. Rep., 874; Palin v. State (Neb.), 57 N. W. Rep., 743;
State v. Smith, 49 Conn., 376; Thompson v. People, 144 Ill., 378;
Ellerbee v. State (Miss.), 41 L. R. A., 569, and see note which collates
a number of authorities. And for other authorities see 17 Am. and
Eng. Enc. of Law, 720. In opposition to the principle announced in
these cases we are cited to Pritchett v. State, 92 Ga., 65, and O'Shields
v. State, 81 Ga., 301. These cases are discussed in Horne v. Roberts
(Ga.), 49 L. R. A., 176. While the latter case follows the earlier cases,
yet it disapproves the doctrine announced by them. We are also referred
to Lewis v. State, 15 Texas Crim. App., 647. That does not appear to
be a well considered case, and the facts are not sufficiently stated to
afford much light on this question. It is stated that the judge was
absent from the courtroom a brief minute to answer a call of nature—
supposing that counsel would take notice thereof. It was not stated
that he was out of the view of the counsel and jury; presumably he may
have been so for a moment. It is further stated that the only incident
transpiring during his absence for the brief moment was that defend-
ant's counsel offered evidence which was objected to; and counsel for
both sides then waited for his return, and then presented the objection
to the testimony. The fact that it is not disclosed that he was out of
the sight and hearing of the trial, and that nothing transpired in his
absence, and that he was only absent a brief moment, evidently suggested
to the learned court rendering the opinion that there was nothing in
the objection. Here, however, we have the absence of the judge; that
is, that he was in another room during the space of about three hours,
while the argument was going on, and that the door was closed between
him and the courtroom, thus putting him out of sight of the counsel
and the jury; suggesting a very different state of facts than that indi-
cated in the Lewis case, supra. True, the judge says he could hear
counsel speaking, yet he does not state that he could hear distinctly

what they said while speaking. Indeed, he says that one of the counsel's voice disturbed him in dictating his charge to the stenographer, and he had the door closed so he would not be disturbed. During this argument, and while the judge was absent, it is stated, and we do not understand it to be seriously controverted, that counsel for the State traveled out of the record to state the fact that he had read from the stenographer's notes and was more familiar with the testimony than the opposing counsel, thus suggesting to the jury that his version of a material issue should have with them a higher regard than that of defendant's counsel. It is also shown that other matters of inflammatory character occurred. But, in our opinion, it is not so much what occurred during the trial as what might have occurred when the judge was absent and not exercising a supervising control over the proceedings. Our Constitution and laws constitute the judge not only an integral but an essential part of the court, and he can not abdicate his functions during the trial of a felony case. He should hear and see all that is done in the courtroom during the trial. We do not mean to say that he should retain the same place and seat on the bench. This might be imposing too great a burden. But we do hold that he must be in such a situation as that he can see and hear what transpires. He must be where he can at all times protect and preserve the legal rights of a party on trial. If for any cause he must be absent, he should stop the proceedings until his return. Because the record before us shows that the judge was not in such a position as that he could see and hear what was being said and done during the argument, and not in a position to see that all the formalities regulating the trial were scrupulously observed, and so situated as to know and determine of his own eye and of his own ear that the trial was being legally conducted, we hold that this was not a trial according to the due course of the law of the land.

We do not deem it necessary to discuss the jury question, as this matter is not likely to arise on another trial.

We believe that the testimony of Charles McLain was admissible, to the effect that appellant stated to him, evidently within five or six minutes after the difficulty, as follows: "I am afraid I have cut him bad. I didn't aim to do it. Lord, what will I do? Won't you go for a doctor for him? I will pay for it. Won't you let me go and see my wife and children." And that in a very few moments after this he asked him if he cut him, and he said yes, but that he (Pate) cut at him (defendant) with a knife first. This last portion of the testimony was objected to, while the first portion was admitted by the court—the court explaining that from Sheriff Long's testimony, deceased was then dead, and that he did not die until half an hour after he was stabbed. A part of this statement had been admitted, and evidently the remainder of the statement was so closely connected with what had preceded, as to be a part of the res gestae. Notwithstanding the judge's explanation, other portions of the bill show that the mere fact that the sheriff said Pate was

dead would not control the question. The sheriff may have made this remark, but from his statement to the sheriff and other witnesses in that connection, the sheriff might have made the remark without knowing that Pate was dead. He had walked rapidly from where Pate was stabbed up to where appellant was. It is shown that this could have been but a short space of time, not more than five or six minutes; and the sheriff could not have meant what he said, because Pate did not die until he was removed from where the sheriff saw him, to a livery stable. Griffin v. State, 50 S. W. Rep., 366; Honeycutt v. State, 57 S. W. Rep., 806; Freeman v. State, 40 Texas Crim. Rep., 545, 51 S. W. Rep., 230.

We do not believe it was competent for the State to prove, as was done, by one witness, that deceased told him to tell his wife good-bye; and by another witness, "they murdered me without cause." As to the first statement it does not appear to have been an issue as to whether deceased at the time he made this dying declaration was not conscious of approaching death. This appears to have been taken for granted. At any rate this was a matter for the court and not for the jury in passing on the admissibility of the testimony. A witness can only state matter involved in a dying declaration, to which deceased could testify if alive and a witness on the stand, and could not give in evidence matters of opinion. For collation of authorities, see White's Ann. C. C. P., sec. 1008; Medina v. State, 63 S. W. Rep., 331.

We believe it was permissible for the State to prove by the witness Guinn that defendant told him, on Monday morning before the killing, he was going to hold Pate to the proposition to go before the constable and settle the matter as to who made the report about the boys having a fight. As explained by the judge this was admissible as impeaching testimony; and also as direct and original evidence tending to show defendant's animus toward deceased.

We also believe it was admissible to prove by Constable Pegues that appellant came to him on Monday in the courthouse yard and told him "I am going to make Pate come to you to-day," to which the constable replied, "John, you promised me Saturday you would let this matter drop, and here you are again." Defendant then started off and the constable said to him, "You had better let that matter drop, John." This was a direct conversation between the witness and appellant, and tended to show his purpose with reference to making deceased go before the constable, in order to settle the matter about who reported the boys to him. What the constable replied to him was a part of the same conversation, in which the constable reminded appellant of his promise to drop the matter. This is not like the Vann case, 77 S. W. Rep., 813, 45 Texas Crim. Rep., 434. In that case the conversation was between third parties, in which appellant did not participate. Nor is it like the Denton case, decided at the present term. In the latter case, although the language was used by the witness to the defendant, yet the act was not stated,

and the language contained a denunciation which, in the absence of some act of the defendant characterizing it, we held would be inadmissible. Here there was a conversation between appellant and the witness, in which appellant declared his purpose to make deceased come before him (the constable) in order to settle the matter in dispute. The constable reminded him of his promise to him on that same subject, and the killing occurred, according to the State's theory, in regard to an attempt by appellant to make deceased go before the constable.

Appellant complains of the court's charge on provoking the difficulty, insisting that there was no evidence authorizing this charge, and that said charges were improperly coupled with other charges on self-defense. In our opinion there was sufficient evidence to authorize the court to charge on provoking the difficulty. Appellant's testimony showed that he acted in self-defense to protect himself from an attack about to be made by deceased on him with a knife; and because of this attack, or attack apparently about to be made, he stabbed deceased. So we have from his testimony the assault of deceased on him in the first instance. Recurring to the State's evidence, we find that appellant and his companion Friou were seeking deceased on that occasion, and they were seeking him for the purpose of making him go before the justice of the place in order to settle the dispute between them as to who may have reported to the constable that certain boys had a fight. According to some of the State's witnesses, when appellant found deceased he insisted on his going with him to the constable; and on his refusal he called him a son of a bitch, and then stabbed him. According to the defendant's statement on this point, he said, "By Golly, I believe you told it." This expression may not have been a sufficient cause to reasonably excite deceased to make an assault on appellant; but, if the jury believed that appellant called deceased a son of a bitch, this would certainly be sufficient to provoke an assault by deceased on him. The jury may have believed a part of the State's evidence and a part of the defendant's evidence. We can not determine this; but we believe there was sufficient evidence to authorize the court to charge on the issue of provoking the difficulty. We would suggest that on another trial the charge on provoking the difficulty follow the decisions on this subject.

Other errors are assigned, but they are such as are not likely to occur on another trial, and we pretermit a discussion of them. For the errors discussed the judgment is reversed and the cause remanded.

*Reversed and remanded.*